## In re AMERICAN & FOREIGN POWER CO., Inc., et al.
### Civil Action No. 490.

District Court, D. Maine, S. D.
Sept. 21, 1948.

---

[1] In 1948 Revision, 18 U.S.C.A. § 912.

[2] In 1948 Revision, 18 U.S.C.A. § 701.

518

McCready Sykes and Herbert Homer Klein, both of New York City, for Protective Committee of $7 and $6 Preferred Stock.

John B. Conley, of Portland, Me., for Charles Monheit, stockholder Electric Bond & Share Co.

Sanford Leonard Schamus, of New York City, for Henry A. Turner.

Samuel Okin, of New York City, pro se.

Harry G. Slater, Paul S. Davis, and Charles H. Kinnane, all of Washington, D. C., for Securities and Exchange Commission.

Ernest L. McLean, of Augusta, Me., and James L. Boone and Nicholas H. Powell (of Reid & Priest), Adrian L. Foley (of White & Case), all of New York City, for American & Foreign Power Co.

John F. MacLane, and Benjamin C. Milner of Simpson, Thatcher & Bartlett, all of New York City, for Electric Bond & Share Co.

Leland S. Sproul, pro se, and Nathan W. Thompson, of Portland, Me., for Leland S. Sproul and L. S. Sproul & Co.

Frank Weinstein, of Weinstein & Levinson, of New York City, specially for Harriet E. Weinstein and John S. Kroese.

Albert J. Fleischman, of Baltimore, Md., Claude L. Gonnet, of New York City, and Brann & Isaacson, of Lewiston, Me., for Norman Johnson group.

Robert Bernstein, of New York City, for Samuel J. Levinson, stockholder American & Foreign Power Co.

Thomas C. Egan, Arnold R. Ginsburg, and Francis Logan, all of Philadelphia, Pa., for John F. McKenna, stockholder American & Foreign Power Co.

CLIFFORD, District Judge.

This is a proceeding brought before this Court by the Securities and Exchange Commission[1] to secure the approval and enforcement of the terms of a plan of simplification and reorganization of American and Foreign Power Company, Inc.,[2] under Section 11(e) of the Public Utility Holding Company Act of 1935.[3] Foreign Power is a Maine corporation, organized and controlled by Electric Bond and Share Company.[4] It is in its own right a holding company, with operating subsidiaries in the utilities field in thirteen Latin American and Oriental countries, serving approximately 1100 communities and 1,800,000 customers.[5] Its total book assets as of December 31, 1946, were $519,903,517.[6]

Its present capital structure is a complicated one and consists of the five following main classes of securities: $30,000,000 of 3% serial notes, wholly owned by Bond and Share; $50,000,000 of 5% Gold Debentures, wholly owned by public security holders; approximately 866,000 shares of $7 and $6 first preferred stock, very largely held by the public, these stocks being entitled to cumulative annual dividends of $7 and $6 a share, a liquidation asset preference of $100 a share and accumulated dividends and redemption at $110 a share and accumulated dividends; approximately 2,570,000 shares of second preferred stock, of which about 84% is held by Bond and Share and 16% is publicly held, this stock being entitled, after satisfaction of the rights of the first preferred, to $7 cumulative annual dividends, a liquidation asset preference of $100 a share and accumulated dividends, and redemption at $105 a share and accumulated dividends; approximately 2,193,000 shares of no par value common stock, 40% held by Bond and Share, and 60% held by the public. Despite Bond and Share's minority holding of common stock, it has been regularly able to cast the majority of votes at Foreign Power meetings and control its administration. Only the common stock enjoys voting privileges.

As of December 31, 1946, the dividend arrearages on the several preferred stocks were as follows:

| Stock | Total | Per Share |
| --- | --- | --- |
| $7 preferred | $35,289,957 | $73.675 |
| $6 preferred | 24,440,556 | 63.15 |
| Second preferred | 292,322,396 | 113.75 |

As is apparent, the arrearages on the second preferred cannot be paid until the first preferreds' claims are satisfied.

In order to bring about the simplification of the corporate structure and a more equitable distribution of the voting power of Foreign Power, the Commission, on May 9, 1940, instituted proceedings under Section 11(b) (2) of the Act. On October 26, 1944, Foreign Power and Bond and Share jointly filed a plan of simplification and reorganization under Section 11(e) of the Act, which proceeding was consolidated with that initiated by the Commission. Hearings were duly had concerning this plan. On May 22, 1947, an amended plan was filed by both companies. Oral arguments were given and briefs filed by the Public Utilities Division of the Commission. Foreign Power, Bond and Share and the representatives of various security holders.

The reaction of the staff of the Public Utilities Division of the S.E.C. was favorable to the adoption by the Commission of the amended plan filed by the companies and this fact became known to some members of the public and is made the subject of arguments by some objectants as will later be indicated.

On November 4, 1947, the Commission published its findings and opinion, in which it found the amended plan was necessary to comply with Section 11(b) of the Act but

[1] Hereinafter referred to as "the Commission."

[2] Hereinafter referred to as "Foreign Power."

[3] 49 Stat. 803, 15 U.S.C.A. § 79k(e). Hereinafter referred to as "the Act."

[4] Hereinafter referred to as "Bond and Share."

[5] Appendix III of Findings and Opinion of the Commission Holding Company Act Release No. 7815. Hereinafter referred to as "the Opinion." Pages cited are those of the printed copy.

[6] Opinion, Appendix IV.

520

unfair in that it deemed the allocations of new securities overcompensated the present public holders of second preferred and common stock to the detriment of the present public holders of the first preferreds. It therefore indicated that it would approve the plan if suggested reallocations were incorporated by the proponents. This was done. After such amendments were filed, and before the Commission issued any order, the opportunity was afforded to all interested persons to request reargument or leave to present additional evidence. No such requests were made. The plan, as modified, was approved by the Commission on November 19, 1947.

Thereafter, on January 6 and 7, 1948, all interested persons were given opportunities to file briefs with and argue before this Court. Supplemental and reply briefs were subsequently filed within the next several months. From such argument and briefs, it was apparent that all counsel fully realized the difficult problems with which the Commission was confronted in its disposition of the amended plan.

The history of Foreign Power is briefly as follows:

Bond and Share began to make investments in foreign countries, principally in Latin America, as early as 1917. In 1923 Foreign Power was organized by Bond and Share to carry on the development of foreign utility opportunities. Although these utilities included the fields of transportation, gas, telephone, water, and ice, the principal emphasis was placed on the same kind of development carried on by Bond and Share within the United States, namely, power and light utilities, revenues from which in 1946 were 85% of total revenues derived from the system.[7]

The first phase of Foreign Power's development took place between 1923 and 1930 when it expanded from a relatively moderate capitalization to one of $421,000,-000. As of 1930, aside from bank loans, this latter amount consisted very largely of capital stock investments, together with a $50,000,000 publicly held bond issue and $20,000,000 in debentures of a Cuban subsidiary of Foreign Power held by Bond and Share.[8] So far as Bond and Share was concerned, its book investment in Foreign Power in 1930 was comprised of stock holdings to the extent of 92% of its total investment.

The second phase of development occurred in the 1930's with the advent of the world depression and debt financing. The era of depression dating from the stock market crash in 1929 apparently did not make itself felt on Foreign Power's operation until approximately the middle of 1931. By that time Foreign Power was caught between the necessity for fulfilling commitments for acquisitions and development work made during 1929 and 1930 and a drastic falling off in its revenues from subsidiaries.[9] There being $50,000,000 in debentures held by the public as well as $50,000,000 in short term notes held by banks, Foreign Power's sole recourse in 1931 was to borrow from Bond and Share in the amount of $30,000,000. In April, 1932, unable to refinance the $50,000,000 bank debt, Foreign Power was forced to borrow an additional $5,000,000 from Bond and Share. Bond and Share's total of $35,000,000 was subordinated to the bank debt and publicly held debentures. Because of being reduced to this inferior risk position, Bond and Share increased its interest rate from 6% to 7%. In 1933 the banks further renewed their loan, in exchange for Bond and Share's taking over $10,000,000 of the $50,000,000 debt.

The years subsequent to 1933 have seen a gradual reduction of the bank loan, it being finally paid in 1943. Dividends were suspended from 1932 until 1940 when partial payments on the first preferred could be made. The strengthened exchange position of the countries serviced by the Foreign Power system, which occurred during the war years, has meant greater earnings for Foreign Power.

In the course of these simplification proceedings there have been three different plans considered. The salient features of each of those plans are indicated in the following table: a money value equivalent,

7 Opinion, p. 3.
8 Opinion, p. 8.
9 Opinion, p. 9.

for comparison purposes, has been included for each class of security holders:

the public second preferred and common. Bond and Share's participation was slightly

| | Plan of 10/26/44 | Amended Plan of 5/22/47 | Plan finally approved by S. E. C. |
|---|---|---|---|
| | New Security Structure: $69,281,200 in 5% debentures: 2,500,000 shares no par common stock, each share being worth $30.00. | New Security Structure applying to both amended and final plan: $35,000,000 in 3½% debentures for redeeming the $50,000,000 publicly held debentures; $91,391,600 in 4¼% debentures; 5,000,000 shares no par common stock each share being worth $15. | |
| **Security Holder** | | | |
| $7 pfd (public) | $80.00 in debs. 20.00 in cash 15.00 in stock $115.00 | $110.00 in debs. 22.50 in stock $132.50 | $110.00 in debs. 31.87 in stock $141.87 |
| $6 pfd (public) | $80.00 in debs. 20.00 in cash 12.86 in stock $112.86 | $100.00 in debs. 18.75 in stock $118.75 | $100.00 in debs. 22.50 in stock $122.50 |
| 2d pfd (public) | $15.00 in stock | $18.00 in stock | $5.63 in stock |
| Common (public) | .60 in stock | .60 in stock | .30 in stock |
| Bond & Share | $ 1,592,210 cash 6,368,700 debs. 56,930,790 stock $64,891,700 (75.9% control) | $ 8,098,900 debs. 50,313,990 stock $58,412,890 (67.1% control) | $ 8,098,900 debs. 50,235,762 stock $58,334,662 (66.98% control) |

It will be seen that the plan filed in 1944 by Foreign Power differs from the amended plan filed in 1947 in that a different security structure is contemplated and that all classes of publicly held securities were awarded increased participation at the expense of Bond and Share. It will also be seen that the amended plan as filed by the companies differed from that approved by the Commission in that the two classes of public first preferred were awarded increased participation at the expense of the public second preferred and common. Bond and Share's participation was slightly reduced, remaining approximately the same. The Commission, in suggesting this reallocation, was influenced by its recognition of the fact that whereas the first preferreds possessed a dividend claim well covered by either corporate or consolidated income together with a claim for substantial arrearages which might reasonably be expected to be fulfilled in 22 years,[10] the second preferred's claim to current dividends is postponed to such time as the arrearages on the first preferreds have

---

[10] Opinion, p. 32.

been made up, with its dividends even then being paid only after current dividends on the first preferreds have been paid. The Commission, after applying what it considered to be appropriate discount rates to reflect this remote expectancy of realizing a return on the part of the second preferred, took into account certain "equities" which it thought operated to the benefit of the public second preferred, the result being to increase its participation by over three times, as is evidenced by the calculations in Table X of the Commission's opinion.[11]

It is this modification of the amended plan, however, which is the object of criticism by all of the objectors. The Court received the impression that some of the objectors felt that what the Commission had done was to reduce the share of the public second preferred and increase that of Bond and Share, giving to the latter more participation than it had shown itself willing to take. This, as can be seen from the above discussion, was not what actually happened.

The approach of the Commission to its task of determining whether the plan was necessary to effectuate the purposes of the Act and whether it was also fair and equitable is worthy of comment by way of illustrating the complexity of the problems and the care it exercised in its investigation and opinion.

In the first place, it found sufficient complexity in corporate structure and sufficient inequity in the distribution of voting power to justify simplification. It then concluded that the contemplated security structure, consisting of two issues of debentures and common stock, was a "necessary" means of fulfilling the purposes of the Act. None of the participants have contested either of these findings, although one of the objectors did propose a substitute plan.

In seeking to determine whether the plan is fair and equitable, the Commission first sought to ascertain the claim of each class of security on the assets of Foreign Power.

Secondly, and with greater emphasis, it sought to discover their claims on expected earnings. Finally, it attempted to make a reasonable allowance to the public security holders based on certain alleged wrongs committed in the past by Bond and Share to the disadvantage of Foreign Power. In trying to assign a figure to the claims asserted against Bond and Share, which might represent a fair settlement, the Commission realized that, although the plan as submitted by the two companies was arrived at only after long and painstaking discussion, it was not a product of actual "arm's length" bargaining and should be carefully scrutinized and subjected to the criticism of all interested persons. It finally concluded, after studying each of the claims, that a lessened participation in the reorganized enterprise by Bond and Share to the extent of $4,600,000 (i.e., in the words of the Commission, a "give-up") fell within the range of a reasonable settlement of the claims.

This approach of the Commission necessarily assumes the rejection in this case of the full application of the so-called "Deep Rock" doctrine invoked in Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, in which a parent-creditor was subordinated to all public security holders because of its past irresponsible financial manipulations of its subsidiary.

This Court's duty, in the words of Section 11(e) of the Act, is to consider whether the plan is "fair and equitable and * * * appropriate to effectuate the provisions of section 11" and to approve it if these standards are met. The Court's function has been made the subject of some discussion both in the briefs and in oral argument. Lahti v. New England Power Association, 1 Cir., 160 F.2d 845, is indicative of the attitude which First Circuit courts have taken toward Commission action. Judge Magruder stated (160 F.2d at page 858):

"In a reorganization of this size and

---

[11] Opinion, p. 39. The value of the publicly held second preferred stock was indicated to be $708,998, absent special equities; it was to be given shares under the amended plan equivalent to $7,-409,700; and the Commission finally approved an allocation of $2,315,531.

complexity, nobody could draft a plan that would measure up to a perfectionist's ideal, and astute minds can always seize upon points of detail upon which a plausible argument can be erected that an ideal equitable equivalent has not been given to this or that security, or that perfect equality of treatment has not been achieved as between the holders of various classes of securities. There necessarily has to be a leeway, a 'range of tolerance', within which the Commission's judgment as to the fairness of the allocations is controlling.

On the other hand, Judge Biggs, speaking for the Third Circuit Court in Matter of Engineers Public Service Company 168 F.2d 722, 734, opinion filed March 19, 1948, states, after noting that the Lahti case "look the other way," that:

"We are of the opinion that a Section 11(e) court must exercise its full and independent judgment as to the fairness and equity of the plan * * *. The court of course may not act capriciously in rejecting valuations made by the Commission nor may the Commission act with caprice in valuing securities. The judicial process is brigaded with the administrative process of the Commission but this does not mean that the court in the field allocated to it by Congress is not to exercise its independent plenary judgment as an equity reorganization tribunal upon every matter relating to the fairness and equity of the reorganization."

In the Eighth Circuit, however, the recent case of In the Matter of Northern States Power Company, D.C.Minn. 4th Div., 80 F.Supp. 193, in an opinion dated August 30, 1948, Judge Nordbye, after taking note of the Engineers case, felt that in view of Massachusetts Mutual Life Ins. Co. v. S. E. C., 8 Cir., 151 F.2d 424, he should give the Commission's findings considerable weight where a rational basis for them existed. His further statements represent in clearcut fashion the attitude of this Court: ·

"I recognize that I should not blandly accept the Commission's findings. It is my duty to exercise my own independent and informed judgment in determining whether I should approve the plan as fair and equit-able. On the other hand, unless I am reasonably clear that the Commission has erred in its factual findings, I should be hesitant to send the plan back to it for further consideration. It has had this reorganization before it for some five years. The questions involved are most difficult and complex because they deal primarily with forecasts for the future, and the appraisal of the innumerable uncertainties and contingent events in the years to come are bound to give rise to difference of opinion. The Commission is the only tribunal which can finally approve a plan of reorganization under the Act. The court is not vested with any authority to propose a plan, or even make suggestions as to any allocation herein as between the preferred and common stockholders which will be binding upon the Commission. The limited authority vested in the court, which has either to approve or disapprove the plan, would seem to lend weight to the soundness of the views of the Eighth Circuit as to the duty of a Section 11(e) court where there is a "rational basis" for the Commission's findings. This Court does not have access to the many facilities which the Commission is afforded through its public utility analysts, accountants, engineers, attorneys, etc., whose experience and training in this particular field should signally equip them to aid the Commission in analyzing and appraising the factual considerations which are controlling herein."

While this Court is not convinced that there is any real difference between not acting "capriciously" (to use the words of Judge Biggs in the Engineers case) and recognizing a "range of tolerance" (to use Judge Magruder's language in the Lahti case), it should of course look primarily to standards set forth in this Circuit. Nevertheless, this Court has endeavored to obtain a thorough understanding of all aspects of this reorganization and to arrive at its own informed and independent judgment based upon its scrutiny of the transcript of oral argument, briefs, and pertinent parts of the record before the Commission.

In these proceedings the objectors are holders of approximately 8500 shares

524

of second preferred stock. 403,000 shares of publicly held second preferred are not represented. The objectors therefore represent 2% of the public holders of their class. It is also a fact that all of the holders of this 2% of second preferred stock, concerning whom records of ownership are available, purchased their shares after these proceedings were initiated. It has been vigorously urged that these objectors have no standing to bring suit against Bond and Share either in the Federal courts or in the courts of New York and that this fact, together with the staleness of the claims asserted, should have some weight in the consideration of their objections.

Despite the appeal of this argument, the Court has given every consideration to the objections in view of Mr. Justice Jackson's statement in the recent case of Comstock v. Group of Institutional Investors, 335 U.S. 211, 214, 68 S.Ct. 1454, 1462, filed June 21, 1948:

"We think that, in the reorganization proceeding, the courts may entertain on their merits objections to a plan even if made by one who might be barred from asserting a cause of action in his own behalf, if the subject matter of the objections is such that it goes beyond the objector's individual interests and affects the fairness and equity of the plan."

The areas of conflict appear to be four in number: (1) Objections based upon alleged lack of jurisdiction and alleged violations of procedural due process; (2) objections to the valuation of the Foreign Power enterprise and the several classes of securities, absent special equities; (3) objections to the allocation of participation in the reorganized enterprise among Bond and Share and the various classes of public security holders; and (4) collateral objections to the feasibility of the proposed plan.

The first class of objections will be considered only insofar as they have been urged and briefed with particularity.

■ 1. Argument was made that jurisdiction of the Commission was lacking because the operating properties of Foreign Power are located outside the United States. The decision in Okin v. S. E. C., 2 Cir., 154 F.2d 27, certiorari denied 329 U.S. 775, 67 S.Ct. 186, 187, 91 L.Ed. 666, is conclusive of this issue, in favor of jurisdiction.

■ 2. Counsel for one of the objectors has raised a question as to the constitutionality of Chapter 64 of the Public Laws of Maine 1945, amending Chapter 49, Section 73, of the Maine Revised Statutes. This section sets up a procedure whereby the customary 80% approval of each class of stock to basic changes in corporate structure can be dispensed with by corporations attempting to carry out a plan of reorganization under the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq. The authorities cited by Maine counsel for Foreign Power [12] clearly show the overriding effect of the federal legislation in this field in the face of which any argument that a state law in accord with such federal legislation is unconstitutional lacks merit.

■ 3. Denial of procedural due process is alleged to be present in the refusal of the Commission to accord party status to the Norman Johnson Group. This group like all other objectors, was granted what is called "limited participation" but what in reality is a very broad privilege. It claims, however, that it was prejudiced in its task of accumulating and presenting relevant information. This Court has previously considered a similar contention in Matter of New England Public Service Company, 73 F.Supp. 452, and has concluded that "limited participation" would not ordinarily constitute a denial of due process. In this case, counsel for the Norman Johnson Group have related in their main brief that, pursuant to their recommendation, proceedings before the Commission were reopened, and, because of their intensive work, over 100 exhibits were offered in evidence, and top officials of Foreign Power were subpoenaed and cross-examined (Johnson Brief, pp. 4 and 5). In fact, at the reopened hearings, counsel for this Group, to use their words, "conducted practically

---

[12] Phillips v. S.E.C., 2 Cir., 153 F.2d 27; Public Service Commission of New York v. S.E.C., 2 Cir., 166 F.2d 784.

all the cross-examinations" (Johnson Brief, p. 8). Moreover, after the final amendment to the plan was filed, all interested persons were given opportunity to introduce additional evidence (Opinion, p. 44) but this Group, together with all other objectors made no attempt further to enlarge the record.[13]

In the face of these facts, it is impossible to give any weight to the serious charges made against the Commission in its adherence to usual custom in denying party status to the Norman Johnson Group.

4. An argument urged by all objectors to the plan, although phrased in varying terms, was that (a) it was improper for the Commission's Staff to have engaged in ex parte discussions with the proponents of the plan, (b) the Staff's expression of opinion prior to hearings on the amended plan made pre-judgment by the Commission inevitable, and (c) the Commission committed an abuse of discretion or acted beyond its power in not accepting the opinion of the Staff of the Public Utilities Division with the result that no particular weight should be given to the Commission's opinion.

In effect, the latter two arguments place some objectors in the position of objecting that the Commission would be unduly influenced and prejudiced by the opinion filed by the Staff of the Public Utility Division, and for that reason such opinion should not have been rendered, while, on the other hand, other objectors complain at the action of the Commission because of its refusal to accept and be bound in all respects by the Staff's opinion. In short, the Commission, according to these objectors, would be in error in either event.

■ The Court feels no serious objection can be made to a procedure whereby representatives of both the Staff and the companies try to work out the details of a plan later to be presented and subjected to careful scrutiny. What is important is the opportunity of a full and open hearing before the Commission takes its final and definitive action. Such an opportunity was granted.

This attitude finds confirmation in Phillips v. S. E. C., 2 Cir., 153 F.2d 27, at page 32, certiorari denied 328 U.S. 860, 66 S.Ct. 1350, 90 L.Ed. 1630, in which the court said that preliminary prehearing conferences to "expedite the settlement of details" should not be interfered with by the courts, unless there is a "very definite showing of prejudice." Such a showing is lacking in the instant case.

■ The fact that the Commission's Staff announced its views in advance of the hearing and the further fact that the Commission's opinion diverged in some respects from that of the Staff do not lessen the weight to be accorded the Commission's opinion. It does indicate a thorough and intensive study by the Commission which did not rubber stamp and accept the opinion reached by a subordinate group within the set-up of the Commission.

It is understandable that certain objectants to the plan would be disappointed to learn that the Commission itself refused to adopt the views of the Staff of its Public Utilities Division, especially when the hoped for action of the Commission would enure to the financial benefit of these objectants. Complete agreement among all parts of an administrative body charged with such a complex task as is the Commission is not to be expected. But no matter how the work may be divided within the Commission, it can have but one voice of authority, that of the Commission itself, and not, as one objector has argued, that of members of the staff of the Public Utilities Division.

■ 5. The point has been made that the Commission was without power to pass on the value of the several unlitigated claims asserted against Bond and Share and its officers. Such, it is said, is peculiarly a judicial function.

It is obvious that to delay the approval of any proposed plan under Section 11 of

---

[13] The only request received at this time by the Commission was from objector Levinson who sought to have the Commission reconsider its Findings and Opinion. No request for reargument or leave to introduce new evidence was received.

the Act until all suits had been litigated and reduced to judgment would be very largely to render the remedy of this section useless. The authorities cited by the Commission are, in the opinion of this Court, conclusive of this question in favor of the absolute and paramount jurisdiction of the Commission to pass on settlements of this nature. See, e. g., Ladd v. Brickley, Trustee, 1 Cir., 1946, 158 F.2d 212.

■ 6. The Norman Johnson Group of objectors has made the allegation that the Commission has been derelict in its twin duties of making a thorough examination and preparing "a full and complete record of all important matters in a reorganization" (Johnson Reply Brief, p. 54). Objector McKenna, however, while complaining generally of an "inadequate factual presentation" in the Commission's Opinion, does not deem it necessary to rely on other facts than those allegedly found by the Commission in its Opinion in order to urge the full application of the Deep Rock doctrine. (McKenna Reply Brief, p. 2.) Other objectors did not raise the point.

As has been discussed above, it was the Norman Johnson Group which was permitted to reopen the proceedings and enlarge the already considerable record by its exhaustive scrutiny of the Cuban situation and which did not see fit to come forward with new evidence or argument when given the opportunity by the Commission. The Court also has no reason to doubt the statement of counsel for the Commission both in its oral argument and its Supplemental Memorandum that the record before the Commission was closed upon agreement of all participants and that this particular objection was heard for the first time in the oral argument presented to this Court. Just as there must be an end to litigation, so must there be an end to records, and this Court affirmatively finds that the record in the instant case discloses a fair, conscientious, thorough and workmanlike task of examination of all matters pertinent to the formulation of a fair and equitable reorganization of Foreign Power.

■ 7. The final argument as to procedure which this Court deems worthy of mention in this opinion is that the Commission should have reopened the hearings generally after its opinion of November 4, 1947, wherein it indicated that it would approve the plan if certain amendments were made. The course followed by the Commission of allowing a period for the filing of requests for reargument and presentation of additional evidence fulfilled the requirements of procedural due process and was in accord with sound administration.

The second main group of arguments concern the highly technical problem of valuation of the Foreign Power enterprise and the several classes of securities, apart from the effect of the claims asserted against Bond and Share.

. The management of Foreign Power had already decided to reflect a write-down of assets from $514,800,000 to $283,500,000.[14]

■ The Commission, however, refused to limit its acceptance to an adjustment which merely indicated how far the management was willing to go at that time in bringing its financial statements into agreement with the factual situation. It determined that its duty, under the circumstances of this case, was to evaluate the system by resort to the well-recognized method of capitalizing earnings. In nontechnical language, the method is one which involves two tasks: First, a reasonable estimate of future earnings must be obtained, and, second, this figure must be multiplied by a figure, called a times-earnings factor, which represents the value of such earnings in the light of the risks and uncertainties involved. This times-yearly earnings factor would be large in the case of a business with a future subject to relatively few risks; it would be correspondingly low in the case of a business subject to greater risks. Neither of these two figures can be obtained with scientific accuracy but must rest upon sound judgment, having in mind all of the circum-

---

[14] Opinion, p. 24.

stances involved. As Dewing has noted with regard to the times-earnings factor, "Yet the determination of this ratio is at best a matter of guesswork. * * *" [15]

In ascertaining the fundamental earning capacity of Foreign Power, the Commission had first to decide whether to give greater weight to consolidated income figures or corporate income figures. Consolidated statements treat parent and subsidiaries as one business and reflect all revenues realized by subsidiaries as having been realized by the parent whether dividends have been paid to the parent or not. Corporate statements, on the other hand, reflect as income only such revenues as have been received by the parent from the subsidiaries. Although it has been the Commission's practice to stress consolidated earnings of holding company systems in most cases, it decided in this instance that the fact that all operating subsidiaries were located in foreign countries made its usual practice inadvisable for the reason that the process of transferring earnings of subsidiaries was subject to such contingencies as fluctuations in foreign exchange, currency restrictions, conversion obstacles, and dangers of expropriation. This decision by the Commission to give greater weight to corporate figures, in view of the circumstances of this case, was wholly proper.[16] For the same reason it appears to be only prudent to discount an "average annual increase" in earnings of $307,000 over the period 1935–1944, especially in view of the fact that actual increases date only from 1941 and in large measure reflect the favorable impact of the War upon the economies of Latin American countries.

Giving primary emphasis, therefore, to the corporate statements, after surveying the risks involved in contemporary foreign operations, and after considering the estimate of reasonably forseeable earnings made by officials of Foreign Power and Bond and Share, the Commission concluded that 1946 figures represented such earnings. These figures were $11,082,000 (per books) and $12,466,761 (pro forma, after taking into consideration economies made possible under the plan). This Court, in its independent judgment, concurs in this finding.

In trying to determine the maximum expectancies of the various classes of stock in the event of liquidation, the Commission's judgment was that an average times-earnings factor of 18.16 could be used. Applying this factor to the 1946 earnings, the Commission concluded that the value of Foreign Power assets applicable to present securities was $201,000,000. This Court is of the opinion that this total figure and the subordinate times-earnings factor are both as reasonable and informed estimates as are possible in this highly complex situation.

That this conclusion is reasonable is apparent from the diverse reactions of two of the more active objectors. The Norman Johnson Group, in its Reply Brief (pp. 5 and 6), said, "Now, how did the Commission arrive at its ultra-pessimistic valuation?" On the other hand, counsel for John McKenna state in their Reply Brief (p. 57), "The Commission's use of 1946 figures as an estimate of foreseeable future earnings is in line with the general pollyanish approach taken by the Commission throughout its Opinion. * * *"

The Court feels that the Commission has avoided the extremes of both pessimism and optimism and that its judgment in this regard was both informed and sound.

A second problem of valuation was the figure to be used as the monetary equivalent for a share of new common

---

[15] Financial Policy of Corporations, 4th Ed., Vol. 1, p. 391.

[16] As Paton has said in his Advanced Accounting (1941) at pages 752 and 753: "The earnings of the subsidiary are not, literally, the income of the parent, and the assets of the subsidiary are definitely not available to meet the claims of creditors of the parent. * * * The general conclusion to be drawn is that although consolidated statements have a legitimate function in certain situations they do not take the place of the reports of constituent companies and should be employed with discrimination and with a recognition of their limitations."

stock assigned to present security holders in exchange for part or all of their present holdings. Assuming that the 1946 earnings were those reasonably foreseeable, the Commission calculated that, after the current claims of prior securities were satisfied, $1.47 of earnings would be applicable to each share of new common stock. It then determined that an appropriate times-earnings figure, reflecting the junior position of the stock and the consequently greater risk involved for the investor, was 9.5 to 11. Hence the "long-term value" assigned to the stock was from $14 to $16 a share. This range was not, contrary to the argument of some objectors, in sharp conflict with the testimony of proponents who stated that a possible "normal" value was $20 a share but that a "probable present market value" at the time of the hearings was about $16. The Court is in accord with the median figure of $15 used by the Commission in allocating new shares of common stock.

 The third problem of valuation concerned the $50,000,000 presently outstanding publicly held debentures. The plan contemplates payments to holders of these securities in an amount equal to face value plus the call premium of $7.50 per $100 of face value. This provision met with the substantial approval of all participants. For example, counsel for the Norman Johnson Group stated (Transcript, p. G–1): "As to the fifty million dollars of debenture five's that are outstanding there never was any question that their position was unassailable and that they will be taken care of in cash at a premium, and I have no quarrel with that."

However, objector Levinson, apparently for the first time, argued to this Court that the market for these debentures both prior to and subsequent to the filing of the original plan was substantially under 100.

Such an observation can have little weight as opposed to the deliberate judgment as to essential value of the Commission. Moreover, as counsel for holders of first preferred stock has aptly said (Berdell Reply Brief, p. 3), "It is notorious that market values are sensitive to litigious bombardment."

Objector Levinson also argues that it was error to assign the first preferred values of $141.88 and $122.50 (as compared with total assets preference and arrearages totaling $173.657 and $163.15, respectively) in view of the failure of Foreign Power by-laws to provide for the payment of call premiums in the event of statutory simplification proceedings. But it is clear that the Commission arrived at these figures not from a conception that this was a "call" but from a consideration of what was the fair investment value of these stocks, in accordance with the overriding policy of Otis & Co. v. S. E. C., 323 U.S. 624, 65 S. Ct. 483, 89 L.Ed. 511.

The Norman Johnson Group has devoted a large part of their effort to opposing the inclusion of Cuban debentures held by Bond and Share in the proposed reorganization at full value. These debentures, in the amount of $19,500,000, are obligations of a subsidiary of Foreign Power, the Cuban Electric Company, and were transferred to Bond and Share from Foreign Power in 1930. Objection is made, first, that these debentures should not be included because they are not a debt of Foreign Power and, second, that, if they are to be included at all, they should not be the basis for allocating to Bond and Share new securities in the value of $19,500,000, for the reason that the Cuban debentures are worth less than their face value.

The Commission saw fit to approve the inclusion of these bonds in order to eliminate at least one complicated relationship, that between "grandfather" and "grandson," and to provide a wider asset base for the proposed reorganized enterprise. In making this decision, it cannot be said to be in error. In evaluating the Cuban debentures at par, the Commission felt that at maturity (May 1, 1948) the worth of the underlying Cuban assets would be greater than the debentures and any obligations senior to it, and that present and contemplated earnings are sufficient to cover the full amount of interest on these

bonds. The Norman Johnson Group made the point that past earnings figures were misleading in that no adequate depreciation policy had been pursued. However, as will later be indicated, Cuban Electric followed the then customary accounting method of establishing a retirement reserve. Lacking evidence that insufficient provision has been made for retirements of equipment as they occur, this Court cannot conclude that the earnings figures have been overstated to such an extent that the Commission must be said to be in error in assigning full value to the debentures.

It has come to the Court's attention that the debentures were not paid at their maturity date, which has occurred since the time of oral argument and the filing of briefs. Indeed, it is asserted that such a situation is cause for remanding the entire matter to the Commission. But a reading of the Commission's opinion, at page 31, reveals that a refunding of these bonds and a reorganization of the Cuban Electric Company were taken into consideration and viewed as a reasonably possible contingency. Certainly the passing of the maturity date, after such consideration by the Commission, is far from affording a justification for remanding the case for further investigation.

This Court, therefore, finds that the Commission acted reasonably and with adequate support in including the Cuban debentures in the proposed reorganization at their face value.

The third and principal issue in this proceeding is whether the Commission erred in its allocation of new securities as between Bond and Share and the public holders of second preferred stock. There are two subsidiary questions: Should the "Deep Rock" doctrine be applied in full, and, if not, did the Commission undervaluate the "give-up" to which Bond and Share should be subject?

It should first be observed that only one objector, John McKenna, actively urged in his brief a claim that the "Deep Rock" doctrine should be applied in its entirety. The Norman Johnson Group is in accord with the Commission's effort in weighing equities but disputes the weight given to the claims against Bond and Share. In other words, it differs from the Commission only to the extent of the "give-up."

The alleged facts mainly relied on which are said to demand the invoking of the doctrine of complete subordination or, alternatively, to require a larger "give-up" by Bond and Share are that Bond and Share controlled Foreign Power; that Bond and Share failed to provide Foreign Power with necessary equity capital; that Bond and Share imprudently caused Foreign Power to continue expanding on borrowed funds, notwithstanding the stock market crash of 1929; that Bond and Share caused Foreign Power's capital stock accounts to be inflated; that Bond and Share received improper profits from Foreign Power on the sale of investments to the latter; that Bond and Share received improper service charge payments from Foreign Power; that Foreign Power was forced to pay excessive interest charges and improper dividends to Bond and Share; and that Bond and Share was responsible for improper depreciation policies in the Foreign Power system.

The full application of the "Deep Rock" remedy of subordination is not something to be mechanically invoked when elements of wrongdoing are found to be present. As Mr. Justice Douglas has stated in Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669:

(The so-called instrumentality rule) " * * * is not properly speaking, a rule, but a convenient way of designating the application, in particular circumstances of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice."

While realizing that the remedy of subordination is not confined to a narrow factual situation, this Court cannot say that Bond and Share was guilty of such consistent dereliction of duty as characterizes the "Deep Rock" cases. In the Standard Gas case the subsidiary from its inception was but "two jumps ahead of the wolf." Without risking its own capital, the parent began immediately to use the subsidiary, a

facility in a different field of operation from that familiar to the parent, as a means of drawing money from the public to itself by means, of frequent note issues and an extortionate, parent-rigged open account. Fraudulent representations were made by the parent to the public concerning a lease. There was no question but that, as the Court said (306 U.S. 307, 323, 59 S.Ct. 543, 83 L.Ed. 669):

"Deep Rock finds itself bankrupt not only because of the enormous sums it owes Standard but because of the abuses in management due to the paramount interest of interlocking officers. * * *"

In the present case there was, undoubtedly, control of the subsidiary by the parent. As Mr. Justice Jackson has said in Comstock v. Group of Investors, 335 U.S. 211, 229, 68 S.Ct. 1454, this is "a relationship between corporations which the law has not seen fit to proscribe." There were, as the Commission stated, unquestioned errors of judgment on the part of Bond and Share as well as evidence of improper practices. But, as shall be seen, there were few transactions about which it can be definitely said today that they involved "unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary * * *" 335 U.S. 211, 229, 68 S.Ct. 1454. In addition, there are two circumstances which place the parent-subsidiary relationship in a much different light in this case from that in the Standard Gas case. In the first place, Bond and Share, working in a field familiar to it, that of light and power utility development, risked a large financial stake in Foreign Power, both at the outset and later in its career. The stake was not to be found in its investment in common stock, for such was almost uniformly issued as a bonus to both Bond and Share and the public, but in second preferred stock, in which it had an investment of $214,000,000

in 1930. The occasions on which Bond and Share took debt securities which are recognized in this reorganization, were at a time when Bond and Share had built up a large investment in the equity of Foreign Power, when further financing was necessary because of prior commitments,[17] the breach of which would have meant litigation, liability, and loss of franchises, when private financing was out of the question, when it would have been a breach of duty to the security holders of Bond and Share to expect it further to commit a large sum to equity investment, and when there is no dispute but that Foreign Power received cash in amounts equivalent to the debt securities. For a parent to make loans to a subsidiary is not in itself overreaching. Arnold v. Phillips, 5 Cir., 117 F.2d 497. Barlow v. Budge, 8 Cir., 127 F.2d 440. For it to make loans under the above circumstances may even be commendable. However that may be, it is clear that these circumstances of debt creation were far different from those in the Standard Gas case.

The second major circumstance to bear in mind is that the overshadowing cause of Foreign Power's misfortune was the drastic effect which the world depression had upon foreign exchange. Counsel for Bond and Share in their Reply Brief (pp. 20, 21) have cited the extent to which both Latin American imports into the United States and loans to Latin America dropped off, with the result that foreign exchange declined over 30% from 1929 to 1932. Although the intervention of the depression should not obscure any wrongs for which Bond and Share is justly chargeable, neither should its disastrous effect be attributed to Bond and Share.

This is far from saying that Bond and Share is free from fault. The Commission has given its opinion, preliminary to assessing to Bond and Share a proper "give-up" figure, as to the probable ex-

---

[17] Record, pp. 1997, 1998. The 1931 annual report for Foreign Power, at page 5, stated: "During 1931 a total of approximately $24,000,000 in United States currency and in other currencies calculated at rates of exchange ruling at time of payment was spent for improve- ments and additions to properties, primarily for the completion of developments initiated prior to 1931. In 1932 construction expenditures are being held to the lowest possible limits." Foreign Power Exhibit 19–M.

tent of wrongdoing involved in the several unlitigated claims. Objectors have sought to read into these observations a Deep Rock "pattern" of wrongdoing. This Court deems it important to ascertain just what the Commission thought about each claim and to make clear its own judgment.

1. Certain transactions in the 1920's involving the acquisition of foreign holdings by Foreign Power from Bond and Share, known as the Mentz, Havana, and Sapco transactions, gave rise to inflation of Foreign Power's capital stock account in the aggregate amount of $35,000,000. The Commission felt that public holders of both common and second preferred stock made purchases in the belief that a substantially larger real investment existed, and determined that the equities deriving from these conditions should be largely the basis for interclass adjustments rather than the basis for a corporate claim against Bond and Share. In short, the Commission used this claim as a reason for giving the second preferred and common stock more than their pro rata share of the securities of the new enterprise because it considered that these classes had been hurt more by their reliance on a nonexistent "cushion." The argument of Bond and Share, however, that any wrong which might have been done by such inflation of accounts was done to individuals who relied on such accounts at the time of their purchases has considerable force. According to this view, redress of such wrongs to individuals should not be attempted in a reorganization proceeding. Without passing here on the merits of this argument, it is sufficient to say that this Court does not view the conclusion of the Commission on this claim as in any way unjust to the second preferred. It certainly affords no basis for the application of the Deep Rock doctrine.

2. The Norman Johnson Group has argued that the absence of a proper and conservative depreciation policy from the accounting methods of certain subsidiaries constitutes a corporate wrong. The Commission, however, has pointed out that the subsidiaries in question had adopted the retirement reserve method of handling the replacement of worn-out and obsolete equipment. Such a method, although not favored by utilities commissions today, was in the 1920's practiced by many domestic and foreign industries. A showing of wrongdoing in maintaining a proper retirement reserve would require evidence of the reserve being inadequate to finance replacements as the necessity for so doing arose. The evidence does not warrant such a conclusion.

3. Another argument asserted by the Norman Johnson Group is that through the fraudulent manipulations of Bond and Share, Foreign Power acquired its Cuban subsidiary, Cuban Electric Company, without knowing that it was still subject to an old lien which had been purportedly but ineffectually released. Evidence of bad faith in completing this transaction is lacking. It appeared, moreover, that at the time of the transaction the primary obligor on the bonds at the time of the transaction had such assets and earnings as to make it quite unlikely to default any obligation which it might have. Also, the prospects of litigation or liability, even today, are both speculative and remote. On this state of the record it is impossible to predicate Deep Rock liability.

4. Although the Commission found no obligation on the part of Bond and Share to take only equity securities in 1931 and 1932, it stated that (Opinion p. 35) "* * * the general argument that Foreign Power was improperly capitalized, and that Bond and Share was responsible for that fact, has greater force." This argument, the Commission felt, militated particularly in favor of the public holders of common and second preferred stock. Again, it should be noted, it is perhaps questionable whether the Commission is not attempting to remedy a wrong to individuals rather than a wrong to Foreign Power, and whether such a remedy is afforded by the processes of corporate reorganization. In any event, it is not a question open to challenge by the second preferred, who are the chief beneficiaries.

So far as being a possible basis for subordination is concerned, this Court concludes that any improprieties of capitaliza-

532

tion policy on the part of Bond and Share fall far short of the continuous "parlous financial condition" which the parent inflicted upon the subsidiary in the Deep Rock case.

■ 5. The Mentz, Havana, and Sapco transactions also gave rise to claims that Bond and Share profited unconscionably on investments sold to Foreign Power. A lack of witnesses to explain such charges as interest and overhead prevented the Commission from making any conclusion as to the unfairness of these charges. Nothing has been presented to this Court to warrant a different result.

■ 6. Another claim is based on profits realized by Bond and Share from fees for furnishing supervisory services to Foreign Power and for services in acquiring investments for Foreign Power. As to the period prior to the Public Utility Holding Company Act, the Commission found "little or no" evidence of unreasonable profits and "little evidentiary support" for the position that Bond and Share had seized a "corporate opportunity" that should have been made available to Foreign Power. But between 1935, the year of the passage of the Act, and in 1940, profits were realized from service charges in the total amount of $2,000,000. Despite Bond and Share's claim that its practice was exempt from the service-at-cost provisions of the Act because of the foreign operations involved, and a question as to the measure of damage, the Commission gave considerable weight to the claim based on service charges exacted during these years. The Court is in accord with the conclusion but notes that the extent of probable wrong-doing here indicated is not sufficient, either by itself or in conjunction with any inflationary write-ups or improper capitalization to warrant application of the extreme remedy of subordination.

■ 7. The most serious charges against Bond and Share concern the payment of dividends on the second preferred stock at a time when such action was the product of mismanagement and overreaching, and the payment of excessive interest charges to Bond and Share.

From 1928 to 1931 Foreign Power paid second preferred dividends of $36,810,236 of which $28,448,158 were received by Bond and Share. The Commission has found that in 1928 and 1929 not only was there book surplus and current earnings in excess of dividends but that the future prospects of Foreign Power justified such action on the part of management. The payment in 1930 was made under worsened conditions, which, however, could have justifiably been deemed merely temporary. It is perhaps pertinent to note here that the memory of this Court is that during these dark days the statement was repeatedly made that "Prosperity is just around the corner." But in 1931, a $4,727,382 dividend was declared and paid under circumstances when the full impact of the depression was felt and the above justifications were absent. The Commission felt that there was "considerable support" for the claim that this dividend was improper.

This Court, appreciating the difficulty of avoiding the influence of hindsight in adjudging the propriety of conduct which occurred nearly twenty years ago, is of the opinion that the above stated view of the Commission is warranted by the evidence and, in its independent judgment, concurs in this finding.

As for the alleged excessive interest charges, the gist of the Commission's conclusion was that during a period prior to 1944 when loans were outstanding to both banks and Bond and Share, the latter being subordinated to the former, the interest rate applicable to the Bond and Share debt should have been decreased from the 7% effective rate in proportion as the bank loans were reduced, thus reducing the risk to Bond and Share. "Considerable weight" was granted the claim that this conduct was improper.

This conclusion is amply justified by the evidence.

Recognizing the gravity of these two charges, as well as those previously mentioned, this Court nevertheless is not convinced that this is a proper case for subordination of Bond and Share's entire claim. Some counsel for objectors have in their

zeal approached this case as if all the above mentioned allegations of wrong-doing or bad judgment had been proven. As has been indicated, such is not the case. Essentially, what is present here, at worst, is evidence of several kinds of management errors and some instances of overreaching spread over a period of over twenty years, a period in which Bond and Share contributed to Foreign Power much skillful and aggressive management. This has been an enterprise which would today be prospering were it not for the peculiarly drastic effect upon it, as a foreign project, of the world depression.[18] This does not appear to be a situation thoroughly honeycombed by the dubious activities, spoliation, or faithless stewardship of a parent corporation bent on pursuing its main end of using its subsidiary as the means of transferring monies from the public to itself.

 Having decided that the Deep Rock doctrine does not apply in this case, at least in the form of complete subordination, the Court must next decide whether the Commission was justified in imposing upon Bond and Share an equitable limitation in the amount of approximately $4,600,000, the net "give-up."

The Norman Johnson Group has asserted that the Commission acted arbitrarily in reducing an alleged Bond and Share offer of compromise from a $10,000,000 to $15,-000,000 give-up to the present figure. This Group quotes testimony of the Chairman of the Board of Bond and Share, Mr. Calder, mentioning a surrender in the above amounts as being included in the companies' joint plan of October 25, 1944. In answer to this, the Commission points out that it actually decreased the effective participation of Bond and Share by $6,700,000, and that Mr. Calder was talking about a gross give-up figure which would be comparable to a net figure of $3,000,000 or $4,000,000. In the face of this explanation, the Court having read the full context surrounding the quoted passage, this contention as to arbitrary Commission action lacks substance, and this Court accordingly finds that a Bond and Share sacrifice of $4,600,000 is adequate recognition of such management errors and overreaching as may have been committed.

The Court further approves the action of the Commission in awarding 35% of this give-up to the public holders of second preferred and common stock, an amount in excess of that which they would have received on a straight priority basis.

A final group of arguments concerns certain collateral matters.

 It is argued that fairness and equity demand that Bond and Share not emerge from this reorganization with voting control over Foreign Power. The statutory requirement as to distribution of voting power, however, is that control be vested in a class of stock which possesses a substantial equity in the enterprise. Assuming that the give-up figure is an appropriate measure of Bond and Share's wrongdoing, there is no objection to its continued control of Foreign Power, its equity investment being substantial.

Objector Levinson has raised the point that the time has expired within which an institutional bond issue was to have been made, and that the plan should therefore be remanded for modification. But this objection fails to note that the Commission specifically reserved jurisdiction to approve a future issue on similar terms, the commitments in question having expired over a month before the Commission issued its Opinion. The terms on which the Commission has reserved jurisdiction appear to be the fair and sensible approach to this practical problem.

 The mere fact that Bond and Share, a present creditor, is to take stock in the reorganized enterprise and present stockholders are to receive bonds is not evidence of a weakness of "illogic" in the plan, as one objector has put it. The important test is whether, measured by factors of quantity and quality of security, present security holders are receiving fair compensatory treatment. In the opinion of the

---

[18] See, for example, Foreign Power Exhibit 74, which illustrates that if present consolidated income could be converted into dollars at rates prevailing in 1924–1929, Foreign Power could still pay dividends on both first and second preferred stocks and leave a balance for the common stock.

534

Court, all security holders will receive such treatment under the plan.

Objector McKenna attacks the proposed plan as unwise in view of the amount of debt security to be created. However, in view of the ample prospective earnings coverage of interest requirements, the provision for the accumulation of a sinking fund, and the substantial tax savings afforded by the existence of this amount of debt, it cannot be said that the proposed structure is unsound.

The omission of a cumulative voting provision in the plan was within the range of the Commission's discretion. Minority protection is sought to be achieved by proposed by-law amendments requiring large percentages of votes to effect major policy changes.

On September 14, 1948, the Norman Johnson Group filed with this Court a petition to present additional evidence of allegedly changed conditions affecting the plan. The grounds for this petition are that the commitment for the sale of 3½% debentures by way of refinancing the existing 5% debentures has expired; that market conditions have adversely affected the value of the 5% debentures making the proposed payment to holders of these debentures of an amount equivalent to their face value plus the call premium unfair and inequitable; and that the Cuban debentures were not paid at their maturity date and therefore should not be accorded participation up to their face value.

All of these contentions were presented to or foreseen by both the Commission and this Court in both oral argument and briefs. As a reading of the above opinion will reveal, each of these arguments has been carefully considered.

With reference to the argument concerning the 5% debentures, it is apparent that the Norman Johnson Group has reversed its stand as expressed to this Court. At that time, as has been noted, only objector Levinson raised this point, which, however, was amply considered. As to the Cuban debentures, although it is true that the maturity date of these debentures has passed since the date of hearing in this Court, such a situation has been fully anticipated and

considered, the Court concluding that underlying assets and earnings prospects are sufficient to justify the inclusion of these debentures at full value.

The Court, accordingly, feels that since the petition indicates the presence of no facts that were not adequately considered by both it and the Commission, it should be denied. An order to this effect was entered on September 16, 1948.

The Court therefore concludes, after its own scrutiny of the many arguments presented in briefs and oral presentations, and in its own independent judgment, that the plan as approved by the Commission is fair, equitable and appropriate to effectuate the purposes of the Public Utility Holding Company Act, and shall be enforced.

A proposed form of decree in accordance with this opinion will be settled on notice.