**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION,**
Plaintiff,

v.

Donald C. **ALEXANDER,** Commissioner of Internal Revenue, Defendant.

Civ. A. No. 74-70.

United States District Court,
D. Delaware.

June 19, 1975.

James M. Tunnell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John H. Schafer, Charles Lister and Jonathan M. Weisgall, Covington & Burling, Washington, D. C., for plaintiff.

W. Laird Stabler, Jr., U. S. Atty., Wilmington, Del., John J. McCarthy and Donald J. Gavin, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiff International Telephone & Telegraph Corporation ("ITT") seeks judicial review of administrative action taken by defendant Donald C. Alexander in his capacity as Commissioner of Internal Revenue. The challenged action relates to defendant's 1973 revocation of certain previously-issued private letter rulings, thereby giving rise to substantial unanticipated tax liabilities for a large number of ITT shareholders. Plaintiff contends the revocation was arbitrary, capricious, and beyond defendant's statutory authority, and would have the Court issue a declaratory judgment to that effect.

Defendant seeks, by preliminary motion, to test this Court's subject matter jurisdiction to entertain the instant action.

## I. BACKGROUND

On or about April 9, 1969, the boards of directors of ITT and Hartford Fire Insurance Company ("Hartford Fire") executed a proposed plan of merger between Hartford Fire and a wholly-owned subsidiary of ITT known as "ITT Hartford Fire Insurance Corporation." The merger was conditioned, *inter alia*, upon the issuance of a ruling by the Commissioner of Internal Revenue that the proposed merger would qualify as a tax-free reorganization under Section 368(a)(1)(B) of the Internal Revenue Code. 26 U.S.C. § 368(a)(1)(B).

On April 15, 1969, representatives of Hartford Fire submitted a request for such a ruling to the defendant's predecessor as Commissioner of Internal Revenue. On October 13, 1969, the Internal Revenue Service issued a ruling that the proposed merger would qualify as a tax free reorganization if, prior to the date on which Hartford Fire shareholders were to vote on the merger, ITT were to unconditionally dispose of approximately 1.7 million shares of Hartford Fire common stock which it had previously acquired.

The following day, October 14, 1969, ITT requested a supplemental ruling from the Commissioner that a proposed sale of the Hartford Fire common to Mediobanca S.P.A. ("Mediobanca"), an Italian bank, would constitute an unconditional sale within the meaning of the October 13th ruling. On October 21, 1969, the Internal Revenue Service issued a supplemental letter ruling to the effect that the proposed sale would satisfy the requirements of its prior ruling. The ITT-Mediobanca transaction was thereafter consummated on November 3, 1969.

On May 26, 1970, an exchange offer was made to all Hartford Fire shareholders. The offer circular stated that

ITT owned no shares of Hartford Fire, that it would not acquire any such stock if it would affect the tax-free character of the exchange, and that, in the opinion of tax counsel, the exchange would not give rise to shareholder tax liability if, among other things, ITT acquired no Hartford Fire common except in exchange for ITT voting stock. Pursuant to the exchange offer, ITT acquired substantially all outstanding shares of Hartford Fire common.

On March 15, 1974, after an investigation into the facts and circumstances surrounding the request for and issuance of the original and supplemental 1969 rulings, the defendant issued a "technical advice memorandum" which revoked both rulings retroactively. The revocation was predicated upon alleged misrepresentations and omissions by ITT in its application for the supplemental ruling as well as its failure to perform according to its terms the contract with Mediobanca for the sale of Hartford Fire stock. Shortly thereafter, the Internal Revenue Service asserted tax deficiencies against a large number of exchanging shareholders and requested others to waive the statutory period of limitations.

During this period of time, ITT advised all exchanging shareholders it would reimburse them in the event of a "final adjudication of taxability" for all taxes ultimately found owing as a result of the exchange of their shares. It further advised that "special counsel" had been retained to prepare and prosecute test cases, and that such counsel was available, at no cost, to assist individual exchanging shareholders in the prosecution of legal actions; ITT's special counsel have since filed petitions for over 600 exchanging shareholders in the Tax Court.[1]

On April 9, 1974, ITT commenced suit in this Court, seeking a judgment declaring the Commissioner's 1973 revocation invalid. Defendant has responded with a motion seeking dismissal on four principal grounds: (1) plaintiff's lack of standing to contest the tax liability of third persons; (2) the absence of jurisdiction to issue declaratory or injunctive relief pursuant to the terms of 28 U.S.C. § 2201 and 26 U.S.C. § 7421; (3) the sovereign immunity of the federal government to taxpayer suits of the type here instituted; and (4) the absence of jurisdiction over defendant in his personal capacity. For reasons to be articulated more fully below, the Court sustains in principal plaintiff's standing to maintain the instant action, yet, on the present record, concludes that the *action is not cognizable in this Court* [must be dismissed] under the provisions of Sections 2201 and 7421(a).[2] As a result, the sovereign immunity and personal jurisdiction issues are not determined.

## II. STANDING

■ One who seeks to challenge administrative action in a federal forum must, as a threshold matter, satisfy the reviewing court that he qualifies as a "proper plaintiff" to challenge the action in question. This requirement is generally referred to as "standing to

---

1. A total of at least 950 separate proceedings have been instituted in the Tax Court by former Hartford Fire shareholders.

2. In the federal system, standing and subject-matter jurisdiction are both threshold questions. Ordinarily, a negative finding on one of these issues will render discussion of the other unnecessary. However, in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968), the Supreme Court stated that " . . . [W]hen standing is placed in issue in a case the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable. Thus, a party may have standing in a particular case, but the federal court may nevertheless decline to pass on the merits of the case because for example, it presents a political question." 392 U.S. at 99, 100, 88 S.Ct. at 1952. It therefore appears proper in the instant case to pass upon the question of ITT's standing *prior* to reaching the issue of subject-matter jurisdiction that stems from the nature of the relief sought by ITT.

sue." In the context of this case standing embraces both constitutional and nonconstitutional considerations. Constitutionally, the requirement is mandated by the "case or controversy" limitation of Art. III, § 2 and requires that a plaintiff allege some type of "injury in fact." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The nonconstitutional dimension of the standing doctrine, founded largely upon policies of judicial self-governance, additionally requires a demonstration by the aggrieved plaintiff that the injury sustained is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp, supra* at 153, 90 S.Ct. at 830.

■ Does ITT have standing to challenge the retroactive revocation by the Commissioner of Internal Revenue of a prior private letter ruling? As a general rules, such administrative action is reviewable at the instance of a disgruntled taxpayer, either by way of refund litigation in the Court of Claims or a federal district court, or in an administrative challenge in the Tax Court. Standing in these cases presents no serious problem.[3]

Where, however, plaintiff is not an individual whose tax liability is directly affected by a ruling revocation and seeks in a district court action to challenge that revocation, substantial problems are presented with respect to that plaintiff's standing as well as the court's subject matter jurisdiction. Reserving for the moment the inquiry into this Court's jurisdiction to entertain the instant action, it must first be determined whether plaintiff's "third-party" status in the current tax dispute disentitles it to maintain this suit.

## A. Injury in Fact

■ Plaintiff has sustained the requisite "injury in fact" to satisfy the case or controversy requirement of Art. III, § 2. As a result of the Commissioner's allegedly wrongful revocation ITT has suffered three types of injury which confer upon it "such a personal stake in the outcome of the controversy as to assure that concrete adverseness" *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), requisite to a proper presentation of issues for adjudication.

First, plaintiff states that it has been forced to defend numerous suits brought by former Hartford Fire shareholders who detrimentally relied upon ITT's representations in connection with the merger. Although ITT's liability to those shareholders is of a contingent nature at present, it is the necessity of defending these suits that provides plaintiff with a sufficient "stake in the outcome." *Baker v. Carr,* supra. Further, the fact that the shareholders suits are based upon the contents of ITT's exchange offer does not preclude their utilization as an "injury in fact" in the instant case since those suits arose as a direct result of the Commissioner's actions.

Secondly, plaintiff has agreed to indemnify exchanging shareholders for all tax liabilities incurred in the ITT/Hartford Fire merger. As a result of this agreement it is estimated that ITT may ultimately sustain a loss of as much as $100 million. A liability of this magnitude is clearly sufficient to insure "concrete adverseness." *Id.* It can be argued that ITT's indemnification obligation was wholly voluntary and constitutes an attempt to confer standing upon itself when none would otherwise exist. This objection, however, is more properly directed to the second

---

3. *See, e. g.,* International Business Machines v. U. S., 343 F.2d 914, 170 Ct.Cl. 357 (1965) ; Lesavoy Foundation v. Commissioner, 238 F.2d 589 (3d Cir. 1956) ; Aran v. U. S., 259 F.2d 757 (9th Cir. 1958), *cert. de-nied,* 358 U.S. 866, 79 S.Ct. 100, 3 L.Ed.2d 100 (1958) ; Hill v. Reynolds, 75 F.Supp. 408 (D.Minn.1948), *rev'd in part,* 184 F.2d 294 (8th Cir. 1950).

prong of the standing test—whether plaintiff's interest is "arguably within" the zone of interests protected by the relevant statutory or constitutional guarantee; it does not diminish the fact that ITT has sustained a substantial economic injury.[4]

Finally, plaintiff alleges its credibility with its shareholders as well as other segments of the business community who relied upon its representations with respect to the merger has been severely undermined.[5] Not only is this harm attributable to the Commissioner's allegedly unlawful acts, but it is clear that ITT's interest in maintaining its reputation serves to further underscore the adversarial nature of the present suit. *See Jenkins v. McKeithen*, 395 U.S. 411, 423–24, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

## B. Injury to a Protected Interest

■ The second prong of standing requires a demonstration that the injury in fact is arguably within the zone of interests contemplated by the relevant statutory or constitutional guarantee. Based upon the allegations of plaintiff's complaint, the statutory provisions violated by defendant, hence, the provisions which define the relevant "zones of interest," are two: (1) the tax code provisions vesting power in the Commissioner of Internal Revenue to issue and retroactively revoke private letter rulings, 26 U.S.C. §§ 7805(a) and (b),[6] and the rules and regulations promulgated thereunder;[7] and (2) the applicable substantive reorganization provisions of the tax code, including 26 U.S.C. §§ 354(a)(1)[8] and 368(a)(1)(B).[9] In seek-

---

4. *Cf.* Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *cf.* Jaffe, *Standing Again*, 84 *Harv.L.Rev.* 633 (1970).

5. To the extent, if any, that the injury suffered by plaintiff may be characterized as "non-economic," it may equally serve as a predicate for standing under Art. III, § 2. *See* Association of Data Processing Service Organizations v. Camp, *supra* at 154, 90 S. Ct. 827; *see also* United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

6. § 7805. Rules and regulations
 (a) Authorization.—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.
 (b) Retroactivity of regulations or rulings.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.
 Although plaintiff's complaint does not, in express terms allege a violation of Section 7805(b), it *does* complain of the Commissioner's allegedly arbitrary and capricious revocation of a private letter ruling. Under

the circumstances, this would appear to state a claim under Section 7805(b). *See* International Business Machines, Inc. v. U. S., 343 F.2d 914, 170 Ct.Cl. 357 (1965).

7. Although *Data Processing*, which concededly involved Section 10 of the Administrative Procedure Act, speaks in terms of the zone *of interests defined by statutory and constitutional guarantees*, it would seem that administrative rules and regulations must also contemplate protected interests which are relevant for purposes of standing. Were it otherwise, *no citizen aggrieved by a violation* of agency regulations would have standing to seek redress therefor. Moreover, because agency rules and regulations are but an instance of delegated Congressional authority, *it should make no difference whether Congress itself seeks to define the interests worthy of protection or delegates this task to an agency.*

8. § 354. Exchanges of stock and securities in certain reorganizations
 (a) General rule.—
 (1) In general.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

9. § 368. Definitions relating to corporate reorganizations
 (a) Reorganization.—
 (1) In general.—For purposes of parts I and II of this part, the term "reorganization" means—

ing to determine the ambit of interests encompassed by these respective provisions, it is necessary to examine the statutory background of each and the apparent Congressional concerns which prompted their enactment.

Although the authority of the Commissioner of Internal Revenue to issue private letter rulings is generally derived from 26 U.S.C. § 7805(a),[10] its statutory genesis is to be found in Section 801 of the Revenue Act of 1938.[11] In that provision, Congress recognized the need of many taxpayers, including corporations, for some degree of assurance that proposed transactions would qualify for certain tax treatment under the Code; accordingly, Congress authorized the Commissioner to enter into binding closing agreements under which a taxpayer's liability as a result of a proposed transaction might be conclusively settled.[12] By 1940, the closing agreement procedure was recognized as both cumbersome and unsatisfactory to both the Service and the taxpayer. As a result, the Service began to treat rulings requests as potential requests for closing agreements, and the rulings became, in essence, an agreement by the Service to enter into a closing agreement should the taxpayer request it—an "agreement to agree."[13] This procedure was formalized as a letter rulings program in 1953,[14] and is now generally authorized under 26 U.S.C. § 7805(a).

The concerns which prompted the enactment of the closing agreement provisions of the tax code are, for the most part, the same concerns which underlie the present rulings program. As Mertens observes:

Present tax rates are so high that many transactions cannot proceed unless the taxpayers involved can know the tax effects in advance. In response to this situation the Revenue Service has adopted a policy of issuing advisory rulings and determination letters to taxpayers where requests for such rulings or determinations are submitted in writing. This procedure is now of utmost importance particularly in the case of prospective transactions.[15]

■ Both in origin and present operation, the Internal Revenue Service rulings program is based upon a recognized need for certainty in the conduct of business affairs. The "zone of interests" defined by this purpose are far-reaching, touching the conduct of all transactions which might have possible tax consequences. Where, as here, the Service issues and, then for allegedly arbitrary reasons, revokes a letter ruling, these interests are directly implicated. This is true whether or not a corporate entity such as ITT which successfully sought a supplemental ruling may ultimately be liable for the tax consequences of a transaction. The corporation, no less than its shareholders, has a legitimate need to ascertain the tax consequences of a proposed reorganization; having once determined to issue a pri-

---

* * * * *

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporations (whether or not such acquiring corporation had control immediately before the acquisition) ; . . . .

10. Rogovin, The Four R's: Regulations, Rulings, Reliance, and Retroactivity—A View From Within, 52 Standard Federal Tax Reports No. 56 (1965).

11. 52 Stat. 573.

12. See generally 9 J. Mertens, The Law of Federal Income Taxation § 52.01 to .21 (1971 rev. ed.).

13. Rogovin, supra note 8, at 10–11. See also Caplin, Taxpayer Rulings Policy of the Internal Revenue Service: A Statement of Principles, N.Y.U. 20th Institute on Federal Taxation 1 (1962).

14. Rev.Rul. 10, 1953–1 Cum.Bull. 488.

15. 9 J. Mertens, supra note 10, § 49.84, at 156.

vate ruling to a corporation, the Service cannot then claim the corporation was not within the class of persons whom the rulings program was designed to benefit. The harm allegedly sustained by ITT falls within the zone of interests defined by 26 U.S.C. § 7805 and the letter rulings program thereunder.

A similar conclusion is compelled by an examination of the interests emcompassed by 26 U.S.C. § 354(a)(1).[16] The latter statute, which has been a part of the tax code in one form or another since 1921,[17] treats certain defined corporate reorganizations as nontaxable events if specified conditions are met. Specifically, this provision and a concomitant section of the code, 26 U.S.C. § 358, permit exchanging shareholders in a reorganization (as defined in Section 368) to substitute the basis of property exchanged for that of the property received, thereby deferring realization of taxable gain or loss until later disposition of the newly-acquired stock or securities.

Although the tax benefits of Section 354(a)(1) obviously redound to the exchanging shareholders in a corporate reorganization, the legislative history of Section 354's predecessor provisions clearly indicates Congressional solicitude for the corporate principals as well:

> [T]he purpose of the statutory non-recognition of gain or loss from reorganization transactions, favors ascribing to the word "recapitalization" a broad rather than a restricted meaning. Such purpose, as indicated by the Congressional reports printed in the margin, was apparently twofold: *To encourage legitimate reorganizations required to strengthen the financial condition of a corporation,* and to prevent losses being established by bondholders, as well as stockholders, who have received the new securities without substantially changing their original investment. . . .

*Commissioner v. Neustadt's Trust*, 131 F.2d 528, 530 (2d Cir. 1942) (emphasis added), *citing* H.Rep.No.704, 73d Cong., 2d Sess. 14 (1936) and S.Rep.No.558, 73d Cong., 2d Sess. 17 (1936). Inasmuch as Congress was in part desirous of facilitating corporate reorganizations through provisions for tax-free exchanges, revocation of a Service ruling with resultant contraindication of those provisions implicates protected interests of the reorganizing corporation as well as its shareholders. In such circumstances, the aggrieved corporation is within the ambit of interests defined by the relevant statutory provision. It is concluded that the harm sustained by plaintiff as a result of defendant's allegedly arbitrary action under Section 7805 and its allegedly erroneous application of Sections 354(a)(1) and 368(a)(1)(B) is arguably, if not conclusively, within the zone of interests those sections were intended to protect. On either or both grounds, plaintiff has standing to challenge defendant's revocation of its prior letter ruling.

## III. SUBJECT MATTER JURISDICTION

### A. Statutory Background

■■ Congress possesses the power under Art. III, § 1 to create inferior federal courts, vest them with exclusive jurisdiction over matters falling within the bounds of the federal judicial power as delimited by Art. III, § 2, *see Muskrat v. United States*, 219 U.S. 346, 356–62, 31 S.Ct. 250, 55 L.Ed. 246 (1911), and to grant or withhold as much of that jurisdiction as it deems appropriate. *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448, 12 L.Ed. 1147; *See* Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 *Harv.L.Rev.* 49 (1923); *but cf. Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 328–339, 4 L.Ed. 97. In matters in-

---

16. *Supra* note 6.

17. *See* 3 J. Mertens, *supra* note 10, § 20.13, at 47.

volving suits regarding federal taxes this power under Art. III, § 1 to define the class of actions cognizable in the federal courts is buttressed by the sovereign immunity of the federal government, absent Congressional consent, from suits by private citizens in the state or federal courts. *Cary v. Curtis,* 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845); *See also Snyder v. Marks,* 109 U.S. 189, 194, 3 S.Ct. 157, 27 L.Ed. 901 (1883).

Apart from standing, the principal jurisdictional barriers to the maintenance of the instant action are found in 26 U.S.C. § 7421(a)[18] and 28 U.S.C. § 2201,[19] both of which are examples of Congress exercising its power to withhold a portion of the judicial power cognizable under Art. III, § 2 from the federal courts. The former provision, commonly referred to as the "Anti-Injunction Act," formally embodies a long-standing prohibition against suits seeking to restrain assessment and collection of taxes in favor of alternate statutory procedures provided by Congress.[20] Although the Act has no recorded legislative history, the Supreme Court has identified two policies which underlie it: (1) the pro-

tection of the government's need to expeditiously assess and collect taxes with a minimum of judicial interference; and (2) protection of the collector from litigation pending a suit for refund. *Bob Jones University v. Simon,* 416 U.S. 725, 736–37, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

The "tax exception" to the Declaratory Judgment Act is of more recent vintage than Section 7421(a), but it subserves essentially identical policies. Enacted as a rider to the Revenue Act of 1935, the declaratory judgment limitation was designed to foreclose the possibility left open by the original Declaratory Judgment Act that taxpayers might seek pre-assessment determination of tax liability despite the prohibitions of the Anti-Injunction Act. *See* E. Borchard, Declaratory Judgments 850–57 (2d ed. 1941); 73 Colum.L.Rev. 1502, 1506 (1973). Given this identity of purpose, although the language of Section 2201 is ostensibly more encompassing in its prohibition than Section 7421(a), some courts have construed the two provisions *in pari materia.*[21]

Despite a lengthy period of vacillation between strict and loose construction of

---

18. § 7421. Prohibition of suits to restrain assessment or collection

(a) Tax.—Except as provided in sections 6212(a) and (c), 6312(a), and 7426(a) and (b)(1), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

19. § 2201. Creation of remedy

In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. (Emphasis added.)

20. A taxpayer who wishes to contest the legality of a deficiency notice issued by the Commissioner is statutorily limited to one of

several well-defined procedures. In the first instance, the taxpayer may refuse to pay the tax and seek to have the deficiency set aside by filing a timely petition in the Tax Court; the deficiency need not be paid until the Tax Court decision, if adverse to the taxpayer, becomes final. 26 U.S.C. § 6213. In the alternative, the taxpayer may seek to recover the tax by way of a suit for refund in a U.S. District Court or the Court of Claims. In the latter instance, the taxpayer must, prior to instituting suit, file a timely refund claim with the District Director of Internal Revenue. 26 U.S.C. § 7422(a).

21. *See, e. g.,* Tomlinson v. Smith, 128 F.2d 808 (7th Cir. 1942); McGlotten v. Connally, 338 F.Supp. 448 (D.D.C.1972) (three-judge court); Jules Hairstylists of Maryland, Inc. v. U. S., 268 F.Supp. 511 (D.Md.1967), aff'd, 389 F.2d 389 (4th Cir. 1968), *cert. denied,* 391 U.S. 934, 88 S.Ct. 1847, 20 L.Ed.2d 854 (1968). *But cf.* Bittker & Kaufman, Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code, 82 Yale L.J. 51, 58 (1972).

the Anti-Injunction Act,[22] recent pronouncements by the Supreme Court have interpreted the Anti-Injunction Act in stringently literal fashion. In *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), the Court indicated that the prohibitions of Section 7421(a) might be circumvented only if two conditions were met: first, a showing of irreparable injury, and second, a clear demonstration that "under the most liberal view of the law and the facts," the government could not ultimately prevail on the merits. *Id.* at 6–7, 82 S.Ct. at 1129. The Supreme Court has reaffirmed the strictures enunciated in *Williams Packing* in two recent decisions, *Bob Jones University v. Simon*, 416 U.S. 725, 90 S. Ct. 2038, 40 L.Ed.2d 496 (1974) and *Alexander v. "Americans United," Inc.*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974).

Recognizing the jurisdictional obstacles posed by Sections 7421 and 2201, plaintiff would seek to persuade the Court that neither the prohibitions therein nor the interpretations found in *Williams Packing*, *Bob Jones*, and *Americans United* are applicable to the instant suit. Plaintiff's principal contentions are three: (1) because the instant action is one solely for declaratory relief, it does not run afoul of the limitations in either Sections 7421(a) or 2201; (2) assuming the applicability of either Section, Congress could not have intended their application to a plaintiff such as ITT who has no adequate alternative remedy; and (3) to construe Sections 7421(a) and 2201 as barring the instant suit would render them violative of the due process clause of the Fifth Amendment. The Court will consider the arguments *seriatim*.

B. The Applicability of Sections 7421(a) and 2201 to Declaratory Judgment Actions Where There Is No Request For Injunctive Relief

At the outset, plaintiff asserts the limitations of Sections 7421(a) and 2201 are both inapplicable to suits in which only declaratory relief is requested. In the first instance, plaintiff contends, Section 7421(a) is limited by its terms to suits seeking injunctive relief, and, is therefore literally inapplicable to purely declaratory actions. Plaintiff also maintains that Section 2201 is not applicable, arguing that because Sections 7421(a) and 2201 have been construed to be coterminous,[23] the limitations of Section 2201 cannot be broader than those of Section 7421(a). It follows, plaintiff argues, that Section 2201 should not apply where, as here, the provisions of Section 7421(a) do not apply.

■■ Plaintiff, in attempting to remove the jurisdictional obstacles inherent in Sections 7421(a) and 2201 by limiting its request for relief to a declaratory judgment, has raised another jurisdictional hurdle. It is well-settled the issuance of declaratory relief is warranted only if the judgment will conclusively determine the question presented to the Court:

> The discretion to grant or refuse declaratory relief . . . "is a judicial discretion, and must find its basis in good reason." . . . The criteria must always be whether a declaratory judgment will clarify and settle the legal relations in issue and whether such a declaration will afford relief from the uncertainty and controversy giving rise to the proceeding. See Borchard, Declaratory Judgments, pp. 107–109.

*Samuel Goldwyn, Inc. v. United Artists Corp.*, 113 F.2d 703, 709 (3d Cir. 1940). *See generally* 6A J. Moore, Federal Practice ¶ 57.08[4], at 57–45 (1974). Both parties concede that a declaratory

---

22. Bob Jones University v. Simon, 416 U.S. 725, 742–46, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

23. See note 21, *supra*.

judgment *sans* injunction by this Court will, as a practical matter, have no binding effect on them. A declaratory judgment favorable to plaintiff would not be self-executing and would not collaterally estop the Commissioner from fully relitigating all issues in the Tax Court. *Divine v. Commissioner*, 500 F.2d 1041 (2d Cir. 1974). Indeed, plaintiff conceded at oral argument that it sought the Court's judgment to use "for what it may be worth" in the pending Tax Court proceedings.[24]

Plaintiff seeks nothing more than an academic expression of this Court's views on matters to be fully relitigated in another forum. Since a judgment on the merits declaring the respective rights of the parties would at this juncture not serve to resolve the issues in the instant case, the Court, in essence, is being asked to issue an advisory opinion. Since the federal judicial power is limited to the adjudication of cases and controversies, Federal courts lack the power to issue advisory opinions. *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792); 3 Johnston, *Correspondence and Public Papers of John Jay*, 486–89 (1891); *see Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250; 55 L.Ed. 246 (1911); and *see also U. P. W. v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947).[25] Accordingly, the Court, having concluded that the lack of subject-matter jurisdiction would render any declaratory relief granted by it in the instant case merely advisory, finds that it is unable, due to a lack of power, to reach the merits of this dispute.[26]

Alternatively, since the issues presented by this action will be relitigated elsewhere, the Court is justified, under the principles laid down in *Goldwyn* and other cases,[27] in refusing to take equitable cognizance of such an action. If plaintiff is to successfully invoke the

24. Tr. at 28.

25. The Court is aware that the term "advisory opinion" encompasses different classes of jurisdictional defects. In some instances it has referred to a hypothetical question that fails to present a "case or controversy," 3 Johnston, *Correspondence and Public Papers of John Jay*, 486–89 (1891), while in others it has referred to a judgment which would lack finality. Hayburn's Case, 2 U.S. (Dall.) 408, 1 L.Ed. 436 (1792). This potential analytic distinction is not deemed significant. *Cf.* U. P. W. v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

26. It should be noted that this conclusion regarding the advisory nature of any opinion on the merits is entirely dependent upon the Court's further conclusion that Sections 7421(a) and 2201 apply to the facts of the instant case and preclude the granting of the injunctive relief that would be necessary to effectuate any declaration of rights. The Court holds that these jurisdictional restrictions do not violate the Due Process Clause of the Fifth Amendment because of the apparent existence of alternative remedies that may be pursued by the plaintiff, see pp. 1166–1168, *infra*. Should these assumptions as to the existence of alternative remedies subsequently prove incorrect, the limitations of Sections 7421(a) and 2201 which presently render any opinion advisory may not apply for two reasons. First, it may be necessary to review the present interpretation of the two jurisdictional prohibitions' scope to determine whether it was Congress' intent that the bars erected by these statutes should apply even where no alternative remedies exist. Secondly, the absence of any alternative remedies would raise an issue as to whether the two jurisdictional statutes would then be constitutionally infirm as applied. See note 31, *infra*. Accordingly, the Court expressly limits its findings on the advisory opinion issue to the current posture of this law suit.

27. In City of Miami v. Sutton, 181 F.2d 644, 649 (5th Cir. 1950), the court in an analogous situation observed:

Since the issuance of an injunction is the only means by which any declaration of rights could effectively be enforced or bring about a termination of the controversy, the legal impossibility of obtaining such injunctive relief renders a declaration advisory only and therefore futile to effectuate a settlement of the controversy. The opinion and decree of the federal court would not be *res adjudicata* in any subsequent criminal proceeding in the municipal or state court, and the matter of the acceptance of the federal court's declaration would be at last left solely to the voluntary determination of the municipal authorities.

Court's remedial powers, it must seek injunctive, as well as, declaratory relief.

Failure to seek both types of relief does not warrant discretionary dismissal at this time. Dismissal of the complaint for failure to include a request for injunctive relief would leave open the substantial probability that the plaintiff would merely amend its complaint. The Court would then be faced with the same jurisdictional issues which now confront it. Accordingly, it will be assumed that the instant action potentially involves a request for injunctive as well as declaratory relief. It follows that the jurisdictional limitations of both Sections 7421(a) and 2201 must be faced.

### C. Congressional Intent

The statutory procedures established by Congress under which a taxpayer may contest the legality of assessed tax liabilities have previously been described.[28] Both parties appear to agree that these procedures are available only to persons against whom the disputed tax has been assessed; they do not apply to a third party in plaintiff's position who is only derivatively affected by the assessment.

▮ Plaintiff contends that the prohibitions of Sections 7421(a) and 2201 are inapplicable, principally because they are predicated upon the availability of an adequate alternative remedy in the Tax Court or by way of refund litigation in the district courts or Court of Claims. Absent such remedies, plaintiff argues, it cannot be presumed that Congress intended to bar the type of action now before the Court.

In assessing this argument, it is noted that plaintiff does not claim that the existing statutory regime leaves it devoid of all opportunities to air its grievances before a judicial or administrative tribunal.[29] Rather, ITT stresses that development of factual and legal issues

through Tax Court proceedings is inadequate *vis-a-vis* civil litigation in this Court because: (1) discovery devices in the Tax Court are of a much narrower scope than those available in district court litigation; (2) the equitable considerations which form a significant part of this controversy are not cognizable by the Tax Court; and (3) pending suits by exchanging shareholders in the Tax Court are fraught with extraneous issues which necessarily render those suits an inadequate vehicle for the prompt resolution of the controversy between ITT and defendant.

Assuming the substantive accuracy of plaintiff's arguments, they are nevertheless immaterial to the applicability of either Section 7421(a) or 2201 to the instant suit. The procedural remedies provided by Congress may be inadequate *vis-a-vis* an injunctive action for a number of reasons. However, the procedural harshness of the provided remedies is not, absent constitutional infirmity, sufficient to justify their circumvention. In *Bob Jones University v. Simon,* the Supreme Court stated:

> In holding that § 7421(a) blocks the present suit, we are not unaware that Congress has imposed an especially harsh regime on § 501(c)(3) organizations threatened with loss of tax-exempt status and with withdrawal of advance assurance of deductibility of contributions. . . . But this matter is for Congress, which is the appropriate body to weigh the relevant, policy-laden considerations, . . . .

416 U.S. at 749–50, 94 S.Ct. at 2052; *see id.* at 747–48, 94 S.Ct. 2038.

Plaintiff further asserts that the "central purpose" of Sections 7421(a) and 2201 is the restriction of aggrieved taxpayers to the alternative remedies provided by Congress; absent the availability of such procedures, plaintiff

---

28. See note 20, *supra.*

29. For reasons to be discussed more fully, ITT may avail itself of several opportunities

to assert its position on the merits of this action, and has in fact been an active participant in litigation now pending before the Tax Court.

argues, it makes no sense to assume that Congress intended the applicability of these jurisdictional bars. This argument, if accepted, would frustrate the twofold objective of Section 7421(a): the protection of government's need to expeditiously assess and collect revenues, and the protection of the collector from litigation pending a suit for refund. Both purposes are compromised if a third party aggrieved corporation could, in a district court action, hamstring the government in its attempt to assess and collect taxes from numerous taxpayer-shareholders; this is true, moreover, notwithstanding the availability of alternate procedures for judicial or administrative review to affected third persons.[30]

Given the virtual nonexistence of a recorded legislative history, it is difficult to discern the precise scope which Congress intended that Sections 7421(a) and 2201 have; realistically, it is proba-ble that Congress did not consider the applicability of those sections to the unusual situation presented by the instant suit. In such circumstances, we can only be guided by the language and apparent purpose of these statutes, both of which counsel dismissal of district court injunctive actions, whether brought by taxpayers or third parties collaterally affected by tax assessments.

For the foregoing reasons, and absent possible constitutional infirmity, *Bob Jones University v. Simon*, 416 U.S. at 747–48, 94 S.Ct. 2038, the jurisdictional prohibitions of Sections 7421(a) and 2201 must be interpreted to bar the instant suit.

### D. Due Process [31]

#### 1. *Plaintiff's Property Interest*

In *Bob Jones University v. Simon*, the Supreme Court intimated

---

**30.** This conclusion is strengthened in view of the 1966 amendment to Section 7421(a) which extended that Section's prohibition to suits brought by "any person, whether or not such person is the person against whom the tax is assessed." The ostensible purpose of the amendment was the prevention of suits by third parties holding liens on property also subject to federal tax liens; Bob Jones University v. Simon, 416 U.S. at 732, 94 S.Ct. 2038 n. 6. However, the Supreme Court has suggested that the "by any person" phrase applies to *all* third parties seeking to obtain pre-enforcement injunctive relief.

**31.** Notwithstanding the jurisdictional prohibitions of Sections 7421(a) and 2201, the Court nevertheless has the power to inquire into the constitutionality of those respective prohibitions. As previously noted, both statutes are jurisdictional, and are within the power of Congress to enact pursuant either to Art. III, § 1 of the Constitution or the sovereign immunity of the federal government. See pp. 1158–1159, *supra*.

These respective sources of power, however, cannot be utilized by Congress to shield from judicial review governmental action violative of constitutional guarantees. With respect to the Art. III, § 1 power of Congress, Judge Chase in Battaglia v. General Motors Corp. stated:

We think, however, that the exercise by Congress of its control over jurisdiction is

subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of [the] courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation. . . .

169 F.2d 254, 257 (2d Cir. 1948). The Supreme Court has implicitly recognized the principle in cases involving alien deportation, *see, e. g.*, Ng Fung Ho. v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922); and Wong Yang Sung v. McGrath, 339 U.S. 33, 48–51, 70 S.Ct. 445, 94 L.Ed. 616 (1950), and at least one lower federal court has applied it in the context of a tax controversy. Inland Milling Co. v. Houston, 12 F.Supp. 554 (S.D.Iowa 1935). Cf. Eastland, et al. v. U. S. Servicemen's Fund, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) (concurring opinion of Marshall, J.). *See generally* L. Jaffe, Judicial Control of Administrative Action 381–94 (1965); Hart, The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic, *reprinted* in H. Hart & H. Wechsler, The Federal Courts and the Federal System, 330–60 (P. Bator, et al., eds. 1973); Cahn & Cahn, The New Sovereign Immunity, 81 Harv.L.Rev. 929, 953–54 & n. 100 (1968).

that even the draconian provisions of Section 7421(a) could not be interpreted to compel an unconstitutional result. 416 U.S. at 747–48, 94 S.Ct. 2038. Plaintiff suggests that the interpretation of Section 7421(a) to bar the instant suit would be productive of just such a result; specifically, plaintiff argues, the due process clause of the Fifth Amendment guarantees one in its position a meaningful right to be heard where, as here, the government seeks to infringe its liberty or property interests. Absent a meaningful opportunity to air its grievances before an appropriate tribunal, plaintiff concludes, the Court must interpret Sections 7421(a) and 2201 to permit the instant action to proceed.[32]

■ In assessing plaintiff's contentions, it must first be noted that not all persons affected by governmental action are entitled to invoke the due process safeguards of the Constitution. In the first instance, it must appear that such action affects a legitimate property or liberty interest within the meaning of the Fifth or Fourteenth Amendments. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15

(1974) (Powell & Blackmun, JJ., concurring).

■ As a general rule, the citizen *qua* taxpayer possesses a constitutionally cognizable property interest which is implicated by the assessment and collection of taxes. It is accordingly settled that such a citizen must be afforded an opportunity to be heard when the revenue authority proceeds to assess and collect taxes from him. *Brinkerhoff-Faris Trust & Savings Co. v. Hill,* 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930); *Inland Milling Co. v. Huston,* 12 F.Supp. 554, 555 (S.D.Iowa 1935); *see also Anniston Mfg. Co. v. Davis,* 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143 (1937). By contrast, plaintiff here does not seek relief as an aggrieved taxpayer, but as one indirectly harmed by the revocation of a tax ruling and subsequent assessment of third parties. Does a plaintiff in this posture have a property interest cognizable by the due process limitations of the Constitution?

The Supreme Court's decisions in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) have given comprehensive scope to the interests contemplated by the Fifth and

With respect to sovereign immunity, it is equally true that unconstitutional governmental action cannot be shielded through the government's refusal to submit itself to suit. *See* Dugan v. Rank, 372 U.S. 609, 622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). This principle is particularly applicable where, as here, it is alleged that a governmental officer has invaded a liberty or property interest of a private citizen and the latter has not been afforded notice or a meaningful hearing. *See* Public Service Co. v. Corboy, 254 U.S. 153, 159, 39 S.Ct. 440, 63 L.Ed. 905 (1919); Wasson v. Trowbridge, 382 F.2d 807, 811 (2d Cir. 1967).

32. The Supreme Court in *Bob Jones* was not faced with, and specifically left open, the issue here raised by plaintiff. Therein, petitioner was a nonprofit organization whose tax-exempt status was terminated by the Commissioner and who, pending litigation, stood to lose substantial funds by way of

previously deductible private contributions. Recognizing this hardship, the Supreme Court nevertheless stated:

> This is not a case in which an aggrieved party has no access at all to judicial review. Were that true, our conclusion might well be different. If, as alleged in its complaint, petitioner will have taxable income upon the withdrawal of its § 501(c)(3) status, it may in accordance with prescribed procedures petition the Tax Court to review the assessment of income taxes. Alternatively, petitioner may pay income taxes, or, in their absence, an installment of F.I.C.A. or F.U.T.A. taxes, exhaust the Service's internal refund procedures, and then bring suit for a refund. These review procedures offer petitioner a full, albeit delayed, opportunity to litigate the legality of the Service's revocation of tax-exempt status and withdrawal of advance assurance of deductibility.

416 U.S. at 746, 94 S.Ct. at 2050.

Fourteenth Amendments. In *Roth* the Court observed:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. *It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.* It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules of understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577, 92 S.Ct. at 2709 (emphasis added). In thus defining the ambit of property interests protected by due process, the Court eschewed more traditional applications of the concept, and focused instead on the existence of an objectively justified reliance by the citizen upon a particular government benefit. The Court stressed that existing "rules or understandings that secure certain benefits" would be sufficient to create a constitutionally cognizable property interest.

 Applying the foregoing principles to the case *sub judice*, the supplemental letter rulings issued to ITT gave rise to a property interest which could not be rescinded absent compliance with the limitations of the due process clause. The Court has previously recited the central purpose of the Commission's letter rulings program: to permit taxpayers to know, in advance, the probable tax consequences of proposed financial transactions. The program is founded upon the need for assurances with respect to the taxability of a transaction; to this end, the private letter ruling may be said to create an "understanding" between the taxpayer and the government upon which the taxpayer may rely in conducting his financial affairs. This "understanding" is, in effect, a property interest. To permit the government to retroactively revoke letter rulings for alleged insubstantial or mistaken reasons would have calamitous results for those segments of the business community who regularly seek to order their affairs in reliance thereon.

If the Internal Revenue Service, as a matter of course, retroactively revoked previously-issued letter rulings for wholly arbitrary reasons, the instant matter might be upon a different footing. However, the Service's own rules provide that a revocation or modification of a ruling will not apply retroactively if specified conditions are met "except in rare or unusual circumstances." 26 C.F.R. § 601.201(1)(5). This explicit statement of policy is, in itself, sufficient to create an expectation that the imprimatur placed upon a proposed transaction by the Commissioner will not, without good cause, be withdrawn.

The Court has considered the possible arguments that a letter ruling purporting to exempt a proposed transaction from taxation is not a "benefit," and that even if it is, third parties such as ITT are merely "incidental" and not "intended" beneficiaries thereof. The first contention is readily answered. While not a direct monetary grant,[33] a letter ruling often effectively places the government's imprimatur upon what might otherwise be considered, from a tax viewpoint, an uncertain and thus unfeasible transaction; in such a case, the monetary value of the government's "blessing" may be incalculable, but it cannot be denied.[34] With respect to the

---

33. *See* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

34. It may be argued that a "nonrecognition ruling" by the Service is nothing more than

second contention, the Court has previously found that ITT falls within the class of persons or the "zone of interests" which the letter rulings program as well as the applicable substantive provisions of the tax code were intended to benefit;[35] accordingly, it must be concluded that plaintiff is a direct and intended beneficiary of the benefits which the government has conferred and then withdrawn.

Therefore, the Court holds that ITT has asserted, and the Commissioner has infringed, a property interest within the meaning of the Fifth Amendment. Having made this determination, it remains to be determined what process is due.

2. Due Process and the Alternative Remedies Available to Plaintiff

The procedures mandated by the Fifth Amendment due process clause are not fixed in content, but vary from one situation to the next depending upon the relative importance of the governmental functions involved and the private interests affected thereby. *Goldberg v. Kelly*, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), *citing Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The interests of ITT are undeniably important, relating as they do to its substantial detrimental reliance upon the Commissioner's 1969 rulings. In a proposed transaction of this magnitude, the legal liabilities attendant upon a corporation's unexpected finding that a transaction is taxable, to say nothing of the loss of shareholder confidence, argue strongly

in favor of affording full opportunity to contest the legality of a ruling's revocation. At the same time, however, the government's interest in preventing judicial interference with the collection and assessment of taxes remains high.[36]

The resultant balancing of these respective interests is the determinant of due process. In view of the alternate opportunities to air its grievances, ITT will not be denied due process if precluded from proceeding in this Court. It is true ITT does not have standing as a formal party to initiate a challenge to the Commissioner's action in the Tax Court, the Court of Claims, or a federal district court. However, the right to appear as a formal party before an administrative or judicial tribunal is not, nor has it ever been, regarded as an indispensable element of due process. Where a nonparty is allowed to fully participate in the prosecution or defense of an action brought in another's name, due process is sufficiently satisfied to conclusively bind the nonparty to any judgment rendered in the action. In *Souffront v. Compagnie des Sucreries*, the Supreme Court stated:

> . . . the nominal plaintiffs or complainants were, in legal intendment, conducting the litigation under the direction and for the benefit of the real owners of the property. The persons for whose benefit, to the knowledge of the court and of all the parties to the record, litigation is being conducted, cannot, in a legal sense, be said to be strangers to the cause. The case is within the princi-

---

an indirect subsidy provided by Congress for certain classes of corporate financial transactions; hence, it is qualitatively indistinguishable from a direct monetary grant to the reorganizing corporation and its shareholders. *Cf.* McGlotten v. Connally, 338 F. Supp. 448 (D.D.C.1972) (three-judge court). Surrey, Tax Incentives as a Device for Implementing Government Policy: A Comparison With Direct Government Expenditures, 83 Harv.L.Rev. 705 (1970) and Surrey, Federal Income Tax Reforms: The Varied Ap-

proaches Necessary to Replace Tax Expenditures With Direct Governmental Assistance, 84 Harv.L.Rev. 384 (1970).

35. See notes 5–17 *supra* and accompanying text.

36. *See* Bob Jones University v. Simon, 416 U.S. at 747–48, 90 S.Ct. 2038 *citing* Cheatham v. U. S., 92 U.S. (2 Otto) 85, 88–89, 23 L.Ed. 561 (1875); and State Railroad Tax Cases, 92 U.S. (2 Otto) 575, 613–14, 23 L.Ed. 663 (1875).

ple that one who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly to the knowledge of the opposing party, is as much bound by the judgment and as fully entitled to avail himself of it, as an estoppel against an adverse party, as he would if he had been a party to the record.

217 U.S. 475, 486–87, 30 S.Ct. 608, 612, 54 L.Ed. 846 (1910). *See generally*, 1B J. Moore, Federal Practice ¶ 0.411[6], at 1552–58 (1974).[37]

In a more recent case factually similar to that now before the Court, *Western Electric Co. v. Hammond*, 135 F.2d 283 (1st Cir. 1943), an indemnitor similar to ITT who had no standing to formally intervene in a pending suit in the Court of Claims initiated a separate action in a district court seeking a declaratory judgment. In remanding the case for further findings from the district court's dismissal, the Circuit Court recognized that plaintiff could not appear as a formal party in the Court of Claims action, but stated that this fact alone did not permit the conclusion that the plaintiff indemnitor would be unable in that forum to protect its interests:

> [W]e are not prepared to lay down an inflexible rule that it would always constitute an abuse of discretion to dismiss a declaratory judgment suit where the action pending in some other court is one in which the plaintiff

in the declaratory judgment suit is not a party or could not become a formal party. If the United States as indemnitee, acting through the Attorney General would permit Western Electric as indemnitor to take over or participate in the defense of the suit in the Court of Claims, Western Electric as a practical matter might have ample opportunity in that litigation to protect its interests.

*Id.* at 287.

■■■■ Apart from the possibility that ITT may participate in the Tax Court proceedings in a manner analagous to that described in *Hammond*, it may also seek to present its grievances there as an amicus curiae. *See* 9 J. Mertens, Law of Federal Income Taxation § 50.92, at 259 (1971 rev. ed.). Such a procedure is frequently utilized where formal intervention is disallowed,[38] and, depending upon the plaintiff's degree of participation, may be sufficient to accord full due process. See *In re American & Foreign Power Co.*, 80 F.Supp. 514, 524 (D.Me.1948), *aff'd sub nom., Kantor v. American & Foreign Power Co.*, 197 F.2d 307 (1st Cir. 1952). In the event one or more exchanging shareholders elect to pay the assessed tax and proceed by way of refund suit in a district court, plaintiff would have the same opportunities to attempt full participation in the conduct of the litigation or to appear as an amicus; in addition, plaintiff as indemnitor would have the right in such an action to seek intervention as a formal party

---

**37.** Significantly, the foregoing doctrine has been applied to indemnitors and warrantors who have derivatively participated in the prosecution or defense of a suit in another's name. *See e. g.*, New Orleans v. Gaines, 138 U.S. 595, 11 S.Ct. 428, 34 L.Ed. 1102 (1891), *cited* in 1B J. Moore, Federal Practice ¶ 0.411[6] at 1558 n. 20 (1974).

**38.** *See, e. g.*, Peterson v. U. S., 41 F.R.D. 131, 135 (D.Minn.1966) and the cases cited therein; Durkin v. Pet Milk Co., 14 F.R.D. 374 (W.D.Ark.1953); Jewell Ridge Coal Corp. v. United Mine Workers, 3 F.R.D. 251, 255 (W.D.Va.1943), *rev'd on other*

*grounds*, 145 F.2d 10 (4th Cir. 1944), *aff'd*, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945); Ocean S. S. of Savannah v. Allen, 36 F.Supp. 951 (M.D.Ga.1941), aff'd, 123 F.2d 469 (5th Cir. 1941).

The Court does not hold that appearance as an amicus curiae is an adequate substitute for participation as a formal party in every instance. Nuesse v. Camp, 128 U.S. App.D.C. 172, 385 F.2d 694, 704 & n. 10 (1967). However, for purposes of affording a party the opportunity to be heard in satisfaction of the requirements of the due process clause, it may in certain situations suffice.

under Fed.R.Civ.P. 24. *Indian Refining Co. v. Dallman*, 31 F.Supp. 455 (S.D.Ill. 1940), *aff'd*, 119 F.2d 417 (7th Cir. 1941); *see also Chalmers v. U. S.*, 43 F.R.D. 286 (D.Kan.1967).

Were this an action in which ITT alleged that the foregoing opportunities to present its grievances were foreclosed, the Court might not be inclined to construe Sections 7421(a) and 2201 as jurisdictional bars to the instant proceeding. Such, however, is not the case. Counsel have represented that plaintiff has had a substantial hand in the preparation and prosecution of numerous suits now pending before the Tax Court. Further, there is no indication that plaintiff will in the future be denied the opportunity to participate, albeit not as a formal party, in proceedings before that tribunal.

Based upon the indicated alternatives open to ITT for the presentation and resolution of its grievances, and in view of the government's substantial interest in foreclosing injunctive actions of the type at bar, the Court at this juncture does not feel that dismissal will constitute a denial of plaintiff's right to due process. However, should it appear during the pendency of the Tax Court litigation that plaintiff is disentitled to fully participate therein, either *in its present nonparty status or as an amicus,*

or that it is additionally denied intervention in district court refund litigation, the Court may be disposed to reconsider the result reached here.[39]

For the foregoing reasons, the ITT complaint must be dismissed for want of jurisdiction. However, the order of dismissal will be without prejudice to plaintiff's right to reinstitute suit if and when it should appear that the alternatives discussed in Part III of this opinion are, as a practical matter, unavailable.

---

39. In holding this way, the Court recognizes that the existence of the alternatives outlined whereby plaintiff may be heard are wholly contingent upon the willingness of one or more taxpayer-shareholders to institute actions challenging the Commissioner in either the Tax Court, the district courts, or the Court of Claims. In *Bob Jones University v. Simon*, the Supreme Court recognized that vicarious litigation through the good offices of a friendly taxpayer might not constitute an adequate legal remedy from the point of view of a third party organization which itself lacked standing to file such a suit. 416 U.S. at 747 n. 21, 94 S.Ct. 2038.

In *Bob Jones*, however, the Court was concerned with a situation involving the willingness of a "friendly donor" to file a refund action seeking a charitable deduction pursuant to the Service's revocation of the recipient's charitable tax status. In such cases, the Court implicitly recognized, most donors

would not seek to contest the Commissioner's action, preferring instead to divert their gifts to other exempt charities or to terminate their gifts altogether. *See also* Eastern Kentucky Welfare Rights Organization v. Schultz, 370 F.Supp. 325, 333 (D.D.C. 1973).

In the instant case, it can hardly be claimed that there is a dearth of affected taxpayer-shareholders desirous of litigating the legality of defendant's revocation. Unlike the "friendly donor," who may have only a marginal stake in contesting a Section 170(c)(2) ruling, the taxpayer-shareholder in a case such as that before the Court has a direct and substantial interest in securing a determination that the defendant acted illegally. For this reason, litigation through the "friendly donor" and the "friendly taxpayer-shareholder," at least from a due process perspective, stand on a vastly different footing.